(22 Misc. Rep. 682.)

MOLONEY v. TILTON et al.

(Supreme Court, Special Term, New York County. November, 1897.)

1. TRUST—VALIDITY.

An instrument expressing all the elements of a valid trust, with power of sale, was duly executed, acknowledged, and recorded, but held by the grantor, who made himself trustee. The beneficiaries, after the execution of the trust, became the wife and stepson, respectively, of the grantor, and resided with him on the premises. The grantor kept secret, as to the bene-

ficiaries, the existence of the trust. After 16 years he sold the property, turning over the trust deed with the title papers, under circumstances which showed an intention to avoid the effect of the trust. *Held* sufficient to evidence the creation of an irrevocable trust.

2. SAME—KNOWLEDGE OF BENEFICIARIES.
   To create a valid trust, it is not essential that the property should be actually possessed by the cestui que trust, nor that the latter should be informed thereof.

3. SAME—FOLLOWING TRUST PROPERTY.
   A declaration of a trust contained a power of sale, the proceeds of which were to be applied for the benefit of the beneficiaries. The property was conveyed to one who had knowledge of the trust and the purpose of the trustee to convert the proceeds. *Held*, the purchase was not in good faith, and the property would still be held by the trustee subject to the trust.

4. SAME—NOTICE TO PURCHASER.
   A deed of trust was recorded. The land was sold, and the deed of trust was examined by the attorney of the purchaser. Accompanying the deed of trust was a letter to the purchaser in regard thereto. *Held* sufficient to put the purchaser on notice of the infirmities of the title.

5. SAME.
   A purchaser, knowing of the purpose of the trustee to deal with the proceeds in contravention of the trust, cannot vindicate his title by plea of ignorance of the trust deed.

6. LIMITATIONS.
   The plea of limitations is ineffectual to a defendant who has continually resided without the state.

Action by Matthew S. Moloney, Jr., against Charles E. Tilton and others. Judgment for plaintiff.

Esek Cowen, for plaintiff.
Nelson S. Spencer, for defendant Tilton.

BEEKMAN, J. On or about April 28, 1864, one Matthew S. Moloney purchased from one Philip Milspaugh the premises known as No. 81 Amity street, in this city. Immediately upon the delivery of the deed, which bears the above date, Moloney executed a declaration of trust with respect to said property out of which this controversy arises. The instrument bears even date with the deed from Milspaugh, and recites that conveyance. By its terms Moloney declares that, in consideration of the sum of $6,500 to him in hand paid, it is not stated by whom, the receipt of which he acknowledges, and for divers other good considerations to him moving, he holds, and will at all times hold and stand possessed of, the property in question, upon the following uses and trusts, namely: To collect the rents, issues, and profits, and after payment of taxes, assessments, repairs, insurance, and all other necessary and lawful expenses, to apply the net income to the joint use of Mrs. Nancy L. Blackburn and her son, Charles Blackburn, during their joint lives and the life of the survivor, and, upon the death of the survivor, in trust to grant and convey said house and lot, or pay over and transfer the proceeds thereof to the issue, if any, of said Charles Blackburn, then living. If there should be no such issue then living, the settlor reserves the estate to himself, if he should then be living, in default of which, however, certain limitations over are made, to which it is unnecessary here to refer. A power of sale is created in the following words:

"And upon the further trust, in case I or my successor or successors shall deem it advisable to sell said house and lot, either at public or private sale, and invest the proceeds in bonds secured by mortgage or improved unincumbered real estate, or in United States or state stocks or securities, and the same to reinvest." The settlor reserved from the grant during his lifetime, for his own use and benefit, or that of such person as he might from time to time appoint, two rooms, which he designated, and part of the cellar and back yard. In case of his death before the completion of any of the trusts so created, he directs his successor to be appointed by the supreme court of the state of New York on the application of any person interested. The instrument was signed and sealed by the settlor, in the presence of a subscribing witness, was acknowledged by him before a commissioner of deeds on May 23, 1864, and on the same day was recorded in the office of the register of the city and county of New York.

On or about July 31, 1880, Moloney executed and delivered to the defendant Charles E. Tilton a deed bearing date on that day, by which, in consideration of the sum of $8,000, he assumed to convey said premises to Tilton. This instrument is in form a full-covenant warranty deed, and purports to be a conveyance of an absolute title by the grantor in his own right. No reference of any kind is made to the declaration of trust or to the power of sale therein, nor is the grantor described as trustee. In short, the deed is exactly what it should have been had the trusts above referred to never been created. Tilton thereupon took possession of the property, and has continued to exercise rights of ownership over it ever since, claiming title thereto under the above deed. On February 1, 1896, Moloney died, and shortly thereafter this action was instituted by Matthew S. Moloney, Jr., who, under a change of name, is the same person described in the declaration of trust as Charles Blackburn, one of the beneficiaries thereunder. The theory of the action is that the conveyance made by Moloney to Tilton was in contravention of the trust, of which fact Tilton was affected with notice; that the latter should be decreed to have held the property upon the trusts declared; that a new trustee should be appointed, to whom Tilton should be required to transfer the property, and also to account for the use and occupation, rents, income, and proceeds of the same since he took possession, in 1880.

It appears from the proofs that for some time after the purchase of the property by Moloney and the execution of the declaration of trust he occupied the premises with Nancy J. Blackburn and Charles Blackburn, then a child of about seven or eight years of age. On August 11, 1864, a little over two months after the execution of the trust instrument, Moloney married Mrs. Blackburn, and thereafter the boy Charles, the plaintiff in this action, assumed the name he now bears, and was treated by the elder Moloney as his son. It is unnecessary to inquire any further into their relationship. It is sufficient for the purposes of this action that it clearly appears from the proofs that the plaintiff and the Charles Blackburn referred to in the deed of trust as the son of Nancy J. Blackburn are one and the same person.

It now becomes necessary to consider the grounds on which the defendant Tilton resists this action. It is contended, first, that the declaration of trust was inchoate and incomplete, and that the proofs are insufficient upon which to rest a finding that the settlor intended that the deed should take effect and become operative upon its execution. In support of this contention the defendant largely relies upon evidence tending to show that Moloney, the settlor, kept all knowledge of the trust from his beneficiaries, and apparently dealt with the property as if it were his own. It is certainly true that the plaintiff never knew of the trust until the year 1895, when the defendant sought, through his intervention, to obtain a confirmatory deed from the father. That the settlor had deliberately adopted a policy of silence upon the subject towards his beneficiaries is sufficiently indicated in the letter which he wrote in 1880 to the defendant Tilton, when a sale of the property was under consideration, which contains the following statement: "No one in our family knows of this declaration of trust of mine, and never will if the sale is made before I die." Accompanying this letter were what the writer described therein as the "title papers in full" of the property, and among them was the original declaration of trust. I shall have occasion to refer to this letter in another connection, but, so far as it is relied upon as evidence of an original unexecuted intention to create the trust, it is of little value. Assuming that a declaration, made by a person situated as the settlor was with respect to this property some sixteen years after the execution of the deed, is competent evidence against those claiming under it, the declaration so made is quite consistent with the integrity of the trust in its original creation. The settlor does not repudiate it as an imperfect act. On the contrary, he transmits the original deed embodying the trusts declared with his other muniments of title for the use of the purchaser.

It will be remembered that the declaration of trust contained a full power in trust to sell for purposes of investment, so that considering this with the fact that the declaration had been recorded and was transmitted to the defendant Tilton, as a paper through which title was to be made, there can be little doubt that Moloney expected to tender a title under this deed, but with the further intention, which he communicated in his letter to Tilton, of dealing with the proceeds in a manner which in contemplation of law amounted to a breach of trust. It becomes important in this connection to note the fact that Moloney and Tilton were intimate friends, and had also some business relations with each other. When the above letter was written, Tilton was endeavoring to sell the property for Moloney. His own purchase of it was an afterthought, and was subsequently agreed upon, apparently to oblige Moloney, when it was found difficult to effect a sale owing to the dullness of the real-estate market. These facts serve to explain the frankness with which the writer disclosed his attitude towards the trust and his purposes with respect to it.

We have, then, an instrument expressing in appropriate form all of the elements of a perfectly valid trust. It was duly executed, acknowledged, and recorded. It was retained by the settlor for 16 years after it had been executed, and was then turned over, with other

papers relating to the title, to a third person for the use and benefit of the person to whom the property might be sold. These acts are hardly consistent with the theory of an unexecuted purpose. Had the trust been created by deed to some other person than the grantor, a very different case would have been presented. In such a case the continued possession of the deed by the grantor, coupled with no other proof of delivery than such as might be presumed from the record, would have raised a serious question with respect to the legal inception of the trust. But, upon the facts of the case as they are, the settlor was the natural and legal custodian of the paper. He was himself the trustee charged with the duty of executing the trust, and the instrument which declared it was properly retained by him in his own possession. What he did was quite sufficient to evidence an executed intention to create an irrevocable trust. The act of recording the paper can hardly be explained on any other theory. It was a step taken for the purpose of advising all who might deal with him with respect to the property that he had impressed it with the trust which he had declared, and that his rights and obligations thereafter with respect to it were such as were set forth in the instrument. Considering the reasons which usually prompt people to record their deeds, the act in this case was hardly called for as a protective measure; so that we may, with a greater degree of certainty, impute to it a purpose to furnish evidence, in a physical and permanent form, of the execution of his intention to create the trusts which the instrument expressed. That intention is to my mind further emphasized by the manner in which the declaration of trust is linked with the original purchase of the property. It is made to bear even date with the deed from Milspaugh to Moloney, which it also recites, and the inference from this is quite justifiable that the property was purchased in furtherance of the settlement and in pursuance of a preconceived plan to create it, which was consummated when the declaration of trust was executed. The previous relations between Moloney and Mrs. Blackburn, their marriage about three months after the date of the execution of the deed, and the paternal attitude which he assumed towards the plaintiff, are facts which also suggest the existence, at the time of the execution of the deed, of a motive to provide for her and her child so compelling in its character as to leave little doubt of his intention that the trust was to take effect without reservation and as a completed act.

The counsel for the defendant lays stress upon the fact that the settlor refrained from informing the beneficiaries of the existence of the trust, and apparently dealt with the property as his own. But this circumstance is shorn of whatever value it might otherwise have had when the situation of the parties towards each other is considered. Both of the beneficiaries were living with Moloney, and were being supported by him, and for a portion of the time they all occupied the premises in question together. In a certain sense, perhaps, they were thus receiving the benefits of the trust, in an indirect way to be sure, but at least to an extent which was doubtless sufficient to satisfy a mind, not concerned with the niceties of legal obligation towards those so closely related to him, that the application

of the income of the property to the use of the beneficiaries was suffi-
ciently made in the support which he gave them. Why he should
have concealed from them the existence of the trust it is useless to
inquire. Personal peculiarities of this kind are not so infrequent as
to leave us at a loss for a conjecture. Whatever may be the infer-
ence which can be legitimately drawn from this attitude which was
thus assumed towards the beneficiaries of the trust, it is not sufficient
to overcome the conclusion which the other facts proven in the case
clearly justify, that the trust had a valid inception.

The law applicable to the case is quite well settled. In the case
of Martin v. Funk, 75 N. Y. 134, the whole subject of trusts resting
on the declaration of the settlor is elaborately considered. Church,
C. J., in delivering the opinion of the court, says (page 138):

"Enough must be done to pass the title, although when a trust is declared,
whether in a third person or the donor, it is not essential that the property
should be actually possessed by the cestui que trust, nor is it even essential that
the latter should be informed of the trust. In Milroy v. Lord, 4 De Gex, F. &
J. 264, Lord Chief Justice Turner, who adopted the most rigid construction of
trusts, in delivering an opinion against the validity of the trust in that case,
laid down the general principles as accurately perhaps as is practicable. He
said: 'I take the law of this court to be well settled that, in order to render
a voluntary settlement valid and effectual, the settlor must have done every-
thing which, according to the nature of the property comprised in the settlement,
was necessary to be done in order to transfer the property, and render the set-
tlement binding upon him. He may, of course, do this by actually transferring
the property to the persons for whom he intended to provide, and the provision
will then be effectual, and it will be equally effectual if he transfer the prop-
erty to a trustee for the purposes of the settlement, or declare that he himself
holds it in trust for these purposes, and, if the property be personal, the trust
may, I apprehend, be declared either in writing or by parol.'"

In the case of Martin v. Funk a deposit was made in a savings bank
by the depositor in terms in her own name in trust for another.
She never informed the cestui que trust of the fact, retained the
bank book in her possession, and died leaving the account open. The
court upheld the transaction as a valid declaration of trust. The
authority of this case has not been overthrown. Cunningham v.
Davenport, 147 N. Y. 43, 41 N. E. 412. To be sure, the question of
intent is always open to inquiry, and, while the presumption is that
the settlor intended that which his declaration and acts naturally
import, it is not a conclusive presumption, but may be rebutted by
proof of other acts and circumstances which are inconsistent with the
existence of any such intention. But it must be remembered that
the ultimate fact to be determined in all such cases is, what was the
intention of the settlor at the time of the alleged creation of the trust?
and the court should be cautious in accepting subsequent acts in ap-
parent derogation of the trust as controlling evidence of a lack of
intention to give complete inception to a trust which has been ex-
plicitly stated.

In the case at bar the weight of evidence is with the plaintiff, and
the establishment of the trust must be considered as quite free from
reasonable doubt. But it is further contended by the defendant
that, assuming the trust to have been validly created, the transfer
to the defendant may be upheld as a valid execution of the power of

sale contained in the instrument. The power so reserved or conferred was a power in trust, capable of being legally and efficiently exercised only for the purposes of the trust; and while a bona fide purchaser for value taking title under such a power is not bound to see to the application of the proceeds, yet if he has knowledge of an intended conversion of the same, in whole or in part, by the trustee, or that the power is being exercised by the trustee in fraud of the trust, he is not in the position of one who purchases in good faith, and the property, notwithstanding the conveyance, still remains in his hands subject to all of the trusts which were originally impressed upon it. The difficulty with the contention of the defendant is that the proofs disclose that he did have knowledge of Moloney's intention to appropriate the proceeds of the sale in a manner which was in derogation of the trust. The agreement between them, which was carried out, was that, of the $8,000 which the defendant Tilton was to give for the property, $2,000 were to be paid by the cancellation of two notes upon which Moloney was individually indebted to Tilton, and the balance was to be paid in cash on Moloney's draft for the amount. The correspondence between them also shows that Moloney expected to use this balance for purposes quite without the purview of the trust. In fact, the statement contained in his letter of May 1, 1880, to the defendant, before mentioned, namely, "No one in our family knows of this declaration of trust of mine, and never will, if the sale is made before I die," was such a clear intimation of a malign purpose as to deprive the defendant of any refuge from the consequences of the trustee's illegal action.

It is claimed by the defendant that he never actually knew of the trust or of the contents of this letter until the defect in his title was brought to his attention in 1895. It appears from the letter itself that it was sent with the title deeds when the latter were transmitted to the defendant. The package in which they were inclosed was received by a person who represented him when he was away from the city. The defendant says that, knowing the papers referred to the property, he did not examine them when informed of their arrival, and has no recollection of having read the above letter, which accompanied them; that when he had agreed to purchase the property he sent the package to his attorney with a request for advice respecting the title; that he received the response that Moloney could give a good title to the property, and that he thereupon closed the transaction.

There seems to be no doubt about the fact that the deed creating the trust was among the papers handed to the attorney, and the inference from Tilton's testimony is that the letter of May 1st was also among them, although upon that assumption it is difficult to understand why the attorney did not advise the defendant of the risk he was taking in dealing with a trustee who revealed a purpose of acting in disregard of his duties. But, if this letter was not transmitted to the attorney with the papers which it originally accompanied, the inference is fair that Tilton had separated it from the others, and the probability that he read it and knew its contents when it was received is thus increased. While I do not question,

his veracity when he says that he does not remember having read it, my conclusion is that it was read by him upon its receipt, but that he has forgotten it. As he did not entertain the idea of purchasing the property himself when it was received, its contents would not have made so strong an impression upon his mind as would otherwise have been the case had the element of personal interest been present.

By whom the deed of the property under which the defendant claims was drawn does not appear. It seems unlikely that his attorney prepared it, as it is, in form, a full covenant warranty deed made by Moloney in his individual capacity, and contains no reference whatsoever, directly or indirectly, to the trust. It does appear that the transaction was closed by the parties themselves without the intervention of any attorney. The most probable explanation of the matter is that the attorney's advice was based upon the existence of the power of sale contained in the declaration of trust, but was taken by Tilton, assuming his actual ignorance of the trust deed, to mean that Moloney individually had a good title which he could convey. If this was the fact, it was certainly a most unfortunate play of cross purposes for the defendant. But, even accepting the defendant's version of the facts, they are not sufficient to relieve his title from attack. He had constructive notice of the trust from the record. He was also affected with the notice which his attorney acquired from the original deed of trust which had been placed in his hands, and he was in possession of the letter of May 1st, which accompanied the title papers. He had thus, apart from the question of constructive notice, in his own hands sources of information which would have fully revealed to him the infirmities of the title he was about to take. If he did not see fit to examine them, it was a misfortune from the consequences of which he cannot reasonably be expected to be relieved. Indeed, in taking the alternative position that the sale to the defendant may be sustained as a valid execution of the power, he must postulate the existence of the trust itself, and in so doing must logically accept the consequences of his knowledge of facts disclosing an actual or proposed violation of the trust by the trustee with whom he was dealing. Knowing, as he did, that Moloney proposed to deal with the proceeds of the sale in a manner which was in fact in contravention of the trust, he cannot avoid the legal consequences flowing from such knowledge by any plea of actual ignorance of the trust deed when he seeks to vindicate his title by claiming under it. The conclusion must be that there was no valid execution of the power.

The defendant has also pleaded the statute of limitations. The evidence, however, shows that he was actually residing out of the state at the time of his purchase of the property, and has continued to do so down to the present time. The plea is therefore ineffectual as a bar to the action. There must be judgment for the plaintiff, with costs. If an accounting for the rents and the use and occupation of the property is also sought, the principles upon which the account is to be taken and stated will be determined on the settlement of the decision and interlocutory judgment.

Ordered accordingly.